| GO GREEN DISPOSAL & | * | NO. 2025-CA-0408 |
|---|---|---|
| RECYCLING, LLC AND | | |
| ANWAR GABER | * | |
| | | COURT OF APPEAL |
| VERSUS | * | |
| | | FOURTH CIRCUIT |
| MABB PRODUCTIONS, LLC | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2023-02165, DIVISION "D"
Honorable Monique E. Barial, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Chief Judge Roland L. Belsome, Judge Tiffany Gautier Chase, Judge Dale N. Atkins)

Joseph B. Landry, Jr.
JOSEPH B. LANDRY, JR., LLC
3015 19th Street
Metairie, LA 70002

     COUNSEL FOR PLAINTIFFS/APPELLEES, Go Green Disposal & Recycling and Anwar Gaber

Michael A. Mahone, Jr.
THE MAHONE FIRM LLC
111 Veterans Memorial Blvd., Suite 810
Metairie, LA 70005

     COUNSEL FOR DEFENDANT/APPELLANT, MABB Productions, LLC

**AFFIRMED**
**FEBRUARY 9, 2026**

DNA

RLB

TGC

The civil lawsuit underlying this present appeal concerned an alleged breach of contract and resulted in a default judgment. In the present appeal, Appellant, MABB Productions, LLC ("MABB"), seeks review of the trial court's February 18, 2025 judgment, which granted in part and denied in part the Petition to Annul Default Judgment ("Petition to Annul") filed by Appellees, Go Green Disposal & Recycling, LLC ("Go Green"), and Anwar Gaber ("Mr. Gaber") (collectively "Appellees"). Specifically, the judgment granted Appellees' Petition to Annul and annulled the default judgment as to Mr. Gaber, finding improper service of process; but the trial court denied Appellees' Petition to Annul with respect to Go Green. MABB only seeks review of the judgment in the former regard, not the latter. For the following reasons, we affirm the trial court's judgment insofar as it granted the Petition to Annul and annulled the default judgment as to Mr. Gaber.

**RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

**MABB's Petition for Damages and Default Judgment**

On April 26, 2019, MABB filed a Petition for Damages against Mr. Gaber and Go Green, wherein it asserted that Go Green breached a contract confected between Go Green and MABB. In the Petition for Damages, MABB also asserted

1

that Mr. Gaber had personally guaranteed the amounts owed by Go Green under the contract such that he was solidarily liable to MABB for the payments owed. On May 31, 2019, MABB requested service on Go Green and Mr. Gaber. In pertinent part, MABB requested service on Mr. Gaber individually at 3617 Corinne Ave., Chalmette, LA 70043 ("3617 Corinne"), his family home.[1] Ultimately, Lieutenant Walter R. Geiser ("Lieutenant Geiser") of the St. Bernard Parish Sheriff's Office served MABB's Petition for Damages on Mr. Gaber's wife at 3617 Corinne in June 2019.[2]

Subsequently, with no answer forthcoming from Mr. Gaber or Go Green, MABB filed a "Motion for Default Judgment" and, in pertinent part, attached an affidavit from Lieutenant Geiser who attested that he served MABB's Petition for Damages in June 2019 on Mr. Gaber's wife at 3617 Corinne, thereby effectuating domiciliary service on Mr. Gaber. On June 7, 2022, the trial court granted MABB's Motion for Default Judgment and entered judgment in favor of MABB for the amount allegedly due on the contract plus interest.

---

[1] As delineated later in this Opinion, MABB and Appellees ultimately stipulated to certain facts ahead of the trial on Appellees' Petition to Annul. In pertinent part, they stipulated:

> Other than a brief period when [Mr. Gaber] was living in Florida for work and . . . in a prison camp in Alabama for 6 months or thereafter in a residential reentry center in New Orleans for 6 months, he continuously lived at 3617 Corinne from the time that he and [his wife] purchased the home in approximately 2006 through the present day.

[2] The parties also debated the sufficiency of the service of process on Go Green before the trial court. However, because neither MABB nor Appellees assigned error to the trial court's denial of MABB's Petition to Annul with regard to Go Green, this Opinion's focus is on the propriety of the service of process on Mr. Gaber.

**Appellees' Petitions to Annul**

Thereafter, Appellees filed their Petition to Annul.[3] In pertinent part, Appellees explained that on the date "on which [MABB] contend[ed] to have effected domiciliary service on [Mr.] Gaber, in his individual capacity, Mr. Gaber was in the custody of the United States Government, Federal Bureau of Prisons," such that "3617 Corinne . . . was not [his] dwelling house or usual place of abode, as required for domiciliary service under [La. C.C.P.] [a]rt. 1234." Moreover, Appellees asserted MABB knew of Mr. Gaber's status in federal custody yet failed to serve him in accordance with La. C.C.P. art. 1235.1 as it should have.[4]

**Joint Pretrial Outline**

On November 4, 2024, Appellees and MABB filed a Joint Pretrial Outline. Therein, in pertinent part, the parties jointly agreed that "[i]n or around 2018, [Mr.] Gaber plead guilty to misbranding of a product and was sentenced to one year which consisted of 6 months of incarceration in a federal prison camp in Montgomery, Alabama," as well as "6 months in a residential reentry center in New Orleans, Louisiana." Further, MABB and Appellees stipulated that Mr. Gaber "was transferred from the federal prison camp to the [Volunteers of America] residential reentry center [in New Orleans, Louisiana ("VA residential reentry center"),] in February 2019" and "left the [VA] residential reentry center in July 2019," whereupon he "immediately returned to live at his house at 3617 Corinne."

Additionally, the parties agreed that Lieutenant Geiser served MABB's Petition for Damages on Mr. Gaber's wife in June 2019 at 3617 Corinne "as a

---

[3] Some of the arguments asserted by Appellees as to why the trial court should annul its default judgment arose in subsequent, supplemental and amending petitions to annul. For ease, this Opinion will refer to all of these filings collectively as Appellees' "Petition to Annul."

[4] As we will discuss more fully throughout this Opinion, La. C.C.P. art. 1235.1 pertains to "Service on [an] incarcerated person."

means to effectuating domiciliary service upon [Mr.] Gaber in his individual capacity." MABB and Appellees specified, however, that they were "not stipulating that such service by Lieutenant Geiser was proper under the facts of this case but merely that it occurred." In pertinent part, the parties also listed the following as a contested issue: "Whether [Mr.] Gaber was required to be served pursuant to [La. C.C.P.] [a]rt. 1235.1 . . . or whether domiciliary service at 3617 Corinne was proper." Essentially, the parties disagreed before the trial court (as they do before this Court) as to whether MABB had to serve Mr. Gaber per the terms of La. C.C.P. art. 1235.1 due to his status in the VA residential reentry center in June 2019, or if domiciliary service was proper.

### Bench Trial and Judgment on Appellees' Petition to Annul

On December 5, 2024, the trial court held a bench trial on Appellees' Petition to Annul. In relevant part, the trial court heard testimony from Mr. Gaber. Additionally, the parties stipulated prior to trial that the deposition testimony of Olugbenga Akanji ("Mr. Akanji") was "admissible for all purposes" and identified him as the program director of the VA residential reentry center when Mr. Gaber was there from February to June 2019. Accordingly, the trial court admitted into evidence Mr. Akanji's deposition testimony. We will summarize Mr. Gaber's testimony and Mr. Akanji's deposition testimony in turn.

*Testimony of Mr. Gaber*

Mr. Gaber testified that at the time of service of process of MABB's Petition for Damages in June 2019, he was living at the VA residential reentry center. Mr. Gaber explained that during his six-month stay at the residential reentry center, he ultimately got a job and received permission to visit his family home at 3617 Corinne and stay overnight there on the weekends. As explained by Mr. Gaber,

4

while on home visits, he had to check in and out with the residential reentry center and also received calls from the residential reentry center on his home's landline thereby enabling the center to verify his location. Regarding the service of MABB's Petition for Damages on his wife, Mr. Gaber testified that she never told him she received the papers from Lieutenant Geiser in June 2019. Rather, as Mr. Gaber explained, the first time he became aware of the lawsuit and the default judgment was shortly before he and Go Green filed their Petition to Annul. Mr. Gaber noted that his wife immigrated to the United States in 1999; her native language was Arabic; and the language spoken in their home was Arabic.

***Deposition Testimony of Mr. Akanji***

During his October 2024 deposition, Mr. Akanji testified that the Federal Bureau of Prisons ("Bureau of Prisons") contracted with Volunteers of America to operate the VA residential reentry center. When asked about how someone ends up at the VA residential reentry center, Mr. Akanji responded that the Bureau of Prisons sends a referral to the center, which he reviews and then decides whether "to accept or deny the individual."[5] Mr. Akanji explained that at the time Mr. Gaber was in the VA residential reentry center, the staff referred to an individual who stayed there as "resident, inmate, [or] client," which all "mean[t] the same thing." Mr. Akanji explained that, at the time of his deposition, the staff of the VA residential reentry center also referred to an individual who stayed there as an "adult in custody."

When asked what individuals are "allowed to do during the period that [they are] staying [in the VA residential reentry center,]" Mr. Akanji explained they

---

[5] Mr. Akanji clarified that "everyone that comes [to the residential reentry center] is from federal prison."

complete an orientation and then must secure employment within twenty-one days of finishing their orientation. Mr. Akanji testified the VA residential reentry center tightly regulates and monitors the residents' schedules. For example, Mr. Akanji explained the VA residential reentry center expects each resident to not only return to the center at the end of the day but to do so at a designated time based on when the resident's employment ended for the day and estimated travel time from the jobsite.

Mr. Akanji testified that when referring an individual to the VA residential reentry center, the Bureau of Prisons deems whether that individual is "competent for release," such "that he should have more access in the community once he completes his orientation [at the center] and is employed." In this regard, Mr. Akanji explained that if the Bureau of Prisons so decrees, then once the individual secures employment and begins working, he becomes "eligible for . . . pre-release status," including "weekend passes" that permit him to "go[] home to spend time with his family for two days, Friday [after work] to Sunday." Additionally, Mr. Akanji explained an individual with a weekend pass is "confined to [his] house"[6] but can receive authorization to conduct limited personal matters such as dinner with his spouse, grocery shopping, haircuts, medical appointments, and educational activities for his children. However, Mr. Akanji stated the activities "are time restricted."

Like Mr. Gaber testified, Mr. Akanji explained the residential reentry center calls to check up on individuals who are away for the weekend on a pass; and Mr. Akanji further stated an individual might "be placed on escape" if he does not

---

[6] Mr. Akanji testified the individual is confined to his house because "the purpose of the pass is to spend time with . . . family members."

answer the phone in a timely manner. Mr. Akanji also clarified during his testimony that an individual at the VA residential reentry center is "still in the custody of the Bureau of Prisons" and serving the time remaining on his sentence. Moreover, Mr. Akanji stated an individual cannot have a weekend pass if the VA residential reentry center has taken "disciplinary action" against the individual for violating one of the center's rules, and violations of the rules might even result in a return to federal prison.

Counsel for Appellees asked Mr. Akanji whether "there [is] someone [at the VA residential reentry center] to accept service of process on behalf of a resident, and Mr. Akanji explained: "[W]e call the individual, and if the individual is around, we let the sheriff know [he is] around . . . . They serve him, they transfer his papers." When asked what happens if a service attempt occurs for "a resident who is not physically [at the VA residential reentry center] at the time," Mr. Akanji responded:

> If [the individual is] not physically [at the VA residential reentry center], then [it] depends on the sheriff if [they are] going to make the determination to leave it or not. If [the sheriff] say[s] [they are] going to come back, we tell them what time [the individual will] be in. [The sheriff will] say we [will] come back. When they come back, then they come serve him.

The trial court took this matter under advisement before ruling.

***Judgment***

The trial court issued its oral ruling and reasons for judgment on January 14, 2025. The trial court stated the issue for resolution was "whether or not domiciliary service on" Mr. Gaber was proper "at his historical residence on Corinne [Avenue] in Chalmette . . . during a period of time where he was still technically in the custody of the Bureau of Prisons and residing at the [VA residential reentry center]

7

where he was doing his work release program." The trial court noted Mr. Gaber "was indeed frequenting his residence" and had "frequent opportunities to have overnight stays" at 3617 Corinne during his time at the VA residential reentry center. However, the trial court also acknowledged that "[w]hether or not [Mr. Gaber] was at the residence on Corinne was not up to him" but rather "based upon whether or not he was given a pass by the" VA residential reentry center. The trial court also pointed out that the terms Mr. Akinaji said the staff used when referencing individuals at the residential reentry center—resident, inmate, client, or adult in custody—"indicate that those persons are not free to do as they will" and "as they wish," thereby further demonstrating "the control that the [VA residential reentry center] has over" the individuals. For those reasons, the trial court found that 3617 Corinne was not Mr. Gaber's "usual place of abode at the time of service," such that domiciliary service at 3617 Corinne was not appropriate. Accordingly, the trial court orally granted Appellees' Petition to Annul with regard to Mr. Gaber.

Subsequently, the trial court signed its February 18, 2025 judgment, which granted Appellees' Petition to Annul and annulled the default judgment with respect to Mr. Gaber but denied Appellees' Petition to Annul with respect to Go Green. MABB's timely appeal to this Court followed.

**ASSIGNMENT OF ERROR**

In its brief to this Court, MABB asserts one assignment of error. Specifically, MABB questions "[w]hether the [trial] [c]ourt erred in nullifying" the default judgment "as to [Mr.] Gaber by determining that the . . . domiciliary service on [Mr.] Gaber through his wife at 3617 Corinne was improper."

8

## DISCUSSION

MABB contends the domiciliary service on Mr. Gaber's wife at 3617 Corinne in June 2019 was proper. Further, MABB argues it did not have to serve Mr. Gaber in accordance with La. C.C.P. art. 1235.1. Mr. Gaber counters the trial court correctly found the attempted domiciliary service "was improper and without effect" because 3617 Corinne "was not his 'usual place of abode' at the time of the attempted service." Additionally, Mr. Gaber contends that because he was incarcerated at the time of service, the service had to be personal and, in support, he cites to La. C.C.P. art. 1235.1; La. R.S. 13:3471(6);[7] and *Blue, Williams & Buckley v. Brian Invs., Ltd.*, 1996-1451, p. 9 (La. App. 1 Cir. 6/20/97), 706 So.2d 999, 1004. Resolution of this matter requires us to determine whether the domiciliary service effectuated on Mr. Gaber's wife at 3617 Corinne was proper in June 2019 during Mr. Gaber's time at the VA residential reentry center which, in turn, informs the propriety of the annulment of the default judgment. With this issue in mind, we next outline the relevant nullity and service of process principles, as well as the applicable standard of review.

### Nullity Principles: Annulment of Default Judgments

In the matter *sub judice*, MABB filed its Petition for Damages and ultimately sought and obtained a default judgment regarding same when no answer was forthcoming from Appellees. In turn, Appellees filed their Petition to Annul, alleging insufficient service of process of MABB's Petition for Damages. Louisiana Code of Civil Procedure Article 2002(A)(2) instructs that "[a] final judgment shall be annulled if it is rendered . . . [a]gainst a defendant who has not

---

[7] Louisiana Revised Statutes 13:3471(6) provides that "[s]ervice of process on an inmate of a public institution may be made by the sheriff or any constable of the parish where the institution is situated."

been served with process as required by law and who has not waived objection to jurisdiction, or against whom a valid default judgment has not been taken."[8] In this latter regard, a "defendant against whom [a] default judgment ha[s] been taken" can bring "suit to annul the [default] judgment" on the basis "that there [was] improper service on [that] defendant in the initial suit." *Carlton v. Electrical Maintenance & Installation, Co.*, 306 So.2d 881, 885 (La. App. 1st Cir. 1974) (citing *Termplan Gentilly, Inc. v. Parker*, 281 So.2d 163, 165 (La. App. 4th Cir. 1973)). "In an action to annul a judgment based on the validity of service, the burden of proof lies on the claimant to show by a preponderance of the evidence that service was not properly made." *Green v. Taylor Rental Props., Inc.*, 55,515, p. 7 (La. App. 2 Cir. 4/10/24), 384 So.3d 421, 426 (citing *Harriss v. Archives Grill, LLC*, 51,298, p. 12 (La. App. 2 Cir. 4/5/17), 217 So.3d 1203, 1210). If the claimant meets this burden of proof, then the default judgment must be annulled. *Carlton*, 306 So.2d at 885. In other words, "[f]or a default judgment to be valid," the default judgment "must be based on valid service of process" of the initial petition. *Termplan*, 281 So.2d at 165.

The reason a court should annul a default judgment on the basis of improper service is because "[p]roper citation is the cornerstone of all actions." *Brigandi v. Egana*, p. 3, 2001-176 (La. App. 5 Cir. 5/30/01), 788 So.2d 680, 681 (citing *Rivers v. Groth Corp.*, 1095-2509, p. 2 (La. App. 1 Cir. 9/27/96), 680 So.2d 762, 763). Thus, without "evidence of proper citation and service of process" that "inform[ed]

---

[8] Louisiana Code of Civil Procedure Article 1702 delineates the default judgment procedure. Because Appellees sought to annul the default judgment based on improper service of MABB's Petition for Damages rather than on the basis that MABB failed to follow the default judgment procedure, we need not outline same.

10

the defendant of the claim against him, in strict compliance of law, all subsequent proceedings are absolutely null." *Id.* (citations omitted).

**Service of Process Principles: Types of Service**

Louisiana Code of Civil Procedure Article 1231 lists the types of service. It states that "[s]ervice of citation or other process may be either personal or domiciliary, and except as otherwise provided by law, each has the same effect." La. C.C.P. art. 1231. As defined in La. C.C.P. art. 1232, "Personal service is made when a proper officer tenders the citation or other process to the person to be served." Domiciliary service occurs "when a proper officer leaves the citation or other process at the dwelling house or usual place of abode of the person to be served with a person of suitable age and discretion residing in the domiciliary establishment." La. C.C.P. art. 1234.

Discussing the types of service, the Louisiana First Circuit Court of Appeal has held that "[s]ervice of citation on incarcerated persons . . . must be personal." *Blue, Williams & Buckley*, 1996-1451, p. 9, 706 So.2d at 1004. Louisiana Code of Civil Procedure Article 1235.1 outlines the process for "[s]ervice on [an] incarcerated person." It states that "[s]ervice is made on a person who is incarcerated in a jail or detention facility through personal service on the warden or his designee for that shift. The warden or his designee shall in turn make personal service on the person incarcerated." La. C.C.P. art. 1235.1(A). It is the applicability or inapplicability of La. C.C.P. art. 1235.1 that the parties dispute in this matter.

**Standard of Review**

As previously stated, MABB and Appellees stipulated to certain facts and to the trial court admitting Mr. Akanji's deposition into the record. Importantly, based

on our review of the record and the parties' briefs, we need not look beyond these undisputed facts to resolve this matter. If "the parties do not dispute the essential facts related to" service, then "the question of whether the trial court properly granted or denied a petition for nullity [based on improper service] is a question of law, and questions of law are reviewed under the *de novo* standard of review." *Anderson v. Anderson*, 20-186, p. 7 (La.App. 5 Cir. 12/23/20), 309 So.3d 868, 874 (citing *Nunez v. Superior Hospitality Sys., Inc.*, 2014-668 (La. App. 5 Cir. 12/23/14), 166 So.3d 1004, 1007). *See also Brooks v. Shamrock Constr. Co.*, 2018-226, p. 5 (La. App. 5 Cir. 12/19/18), 262 So.3d 423, 428 (applying the *de novo* standard in reviewing a trial court court's ruling on a petition for nullity based on an allegation of lack of service of process). Accordingly, we analyze this matter *de novo*.

## Analysis

After thorough research, we have determined that the question of whether La. C.C.P. art. 1235.1 applies to someone in a residential reentry center such that they must be personally served presents a *res novo* issue for this Court. To resolve this matter, we consider whether the particular facts and circumstances of this case called for personal service on Mr. Gaber as an "incarcerated person" under La. C.C.P. art. 1235.1. Before doing so, we provide some background information on residential reentry centers like the one at issue in this matter.

Notably, an individual at a residential reentry center ("RRC") is still serving out the remainder of his federal sentence. *Residential Reentry Centers*, ADMINISTRATIVE OFFICE OF THE U.S. COURTS (March 2020)[9] (explaining that the Bureau of Prisons "has the authority to place an inmate in a [residential reentry

---

[9] This information is available at https://www.uscourts.gov/file/28164/download.

12

center] while serving the remainder of [his] sentence").[10] *See also Rivera-Perez v. Stover*, 757 F.Supp.3d 204, 215 (D. Conn. 2024) (explaining that if the Bureau of Prisons authorizes "[p]rerelease custody," it "may include either placement at a residential reentry center or in home confinement" (citing 18 U.S.C. § 3624(g)(2))). The Bureau of Prisons emphasizes that residential reentry centers are "accountable" for the residents:

> In-house counts are conducted throughout the day at scheduled and random intervals. An inmate is only authorized to leave the [residential reentry center] through sign-out procedures for approved activities, such as seeking employment, working, counseling, visiting, or recreation purposes. During the approved activity, the inmate's location and movements are constantly monitored and [residential reentry center] staff may visit or call them at any time. In addition, when the inmate returns they may be given a random drug and alcohol test.

*About Our Facilities*, FEDERAL BUREAU OF PRISONS (last visited Jan. 23, 2026).[11]

Turning to the undisputed facts, the parties agree Mr. Gaber was a resident of the VA residential reentry center at the time of domiciliary service at 3617 Corinne in June 2019. Mr. Akanji testified that an individual like Mr. Gaber at the VA residential reentry center is "still in the custody of the Bureau of Prisons"; serving the time remaining on his sentence; and subject to a return to federal prison if he violates the center's rules. Mr. Akanji's description of the VA residential reentry center at issue in the matter *sub judice* comports with the Bureau of Prisons' emphasis on "accountability" for center residents. As Mr. Akanji testified, the VA residential reentry center closely monitors the timing of the residents'

---

[10] As an appellate court, we "can take judicial notice of government websites." *Lannon v. Pherian, LLC*, 2024-0757, p. 3 (La. App. 4 Cir. 7/14/25), 418 So.3d 420, 426 (quoting *Pri-Tal v. Progressive Prop. Ins. Co.*, 2024-0531, p. 1 (La. App. 4 Cir. 5/14/25), 414 So.3d 1064, 1068, n.1).

[11] This information is available by visiting the following website: https://www.bop.gov/about/facilities/residential_reentry_management_centers.jsp#:~:text=Providing%20services%20for%20ex%2Doffenders,Inmate%20placement%20into%20a%20RRC.

return from work. Additionally, Mr. Akanji explained the Bureau of Prisons determines whether a resident at the VA residential reentry center will even be entitled to a weekend pass; and, thereafter, the resident can only receive the pass if he completes his orientation and secures employment. Mr. Akanji also testified that a resident might lose his weekend pass if the residential reentry center institutes any disciplinary action against him. Essentially, Mr. Akanji's testimony established that the VA residential reentry center restricted Mr. Gaber's freedom of movement during the work week. Further, Mr. Akanji's testimony established that the weekend pass Mr. Gaber received to go to 3617 Corinne was a privilege, not a right, initially conditioned upon permission from the Bureau of Prisons and then conditioned upon continued permission from the VA residential reentry center, i.e., Mr. Gaber was not guaranteed the weekend pass in the first place and it could be subsequently taken from him.

Moreover, Mr. Akanji's testimony outlined the restrictions imposed on an individual like Mr. Gaber even with a weekend pass, namely confinement to his house unless the residential reentry center grants him permission to go elsewhere; restrictions on the types of personal matters that can be conducted with said permission; and time limits on activities outside the house. Mr. Gaber and Mr. Akanji both confirmed the residential reentry center monitors a resident when he is away on a weekend pass by calling his home phone, and Mr. Akanji explained the center "place[s] [a resident] on escape" if he does not answer in a timely manner. Thus, according to Mr. Akanji's testimony, even Mr. Gaber's weekend pass did not provide him with complete freedom because the VA residential reentry center continued to monitor him.

The Merriam-Webster Dictionary defines "incarcerate" as "to subject to confinement," and the Cambridge Dictionary defines it as "to keep someone in a closed place and prevent them from leaving it." The word "[i]ncarcerated is a nonspecific term which refers to a person confined to a jail, prison, or other institution." *Care of Justice-Involved Populations,* Dawn Davis, MISSOURI MEDICINE (May-June 2022).[12] The term "incarcerated" thus includes confinement and detention of a person and restriction of his freedom regardless what type of facility so detains him and restricts his freedom. In light of the above-delineated confinement, detainment, and restrictions on his freedom and movement that Mr. Gaber experienced during his time at the VA residential reentry center, we find that he was an "incarcerated person" under La. C.C.P. art. 1235.1, such that domiciliary service was improper. As an incarcerated person, the service on Mr. Gaber had to be personal. *Blue, Williams & Buckley*, 1996-1451, p. 9, 706 So.2d at 1004. Had MABB tried to serve Mr. Gaber in accordance with La. C.C.P. art. 1235.1, Mr. Akanji confirmed the VA residential reentry center staff would have informed the sheriff if Mr. Gaber was present at the time so that the sheriff could personally serve him. Mr. Akanji's deposition testimony established that if Mr. Gaber was not present at the time the sheriff arrived, the VA residential reentry center staff would have informed the sheriff when they expected Mr. Gaber to return so that the sheriff could have returned at that time to effectuate personal service on him.

We find our position buoyed by a decision rendered by the Louisiana Second Circuit Court of Appeal ("Second Circuit"). In *Blackledge v. Sol's Pipe & Steel, Inc.*, the Second Circuit considered whether Shawn Blackledge ("Mr.

---

[12] This information is available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9324728/.

Blackledge") was "incarcerated" for purposes of workers' compensation benefits while living at a halfway house[13] at the time he sustained a workplace injury at his inmate-work release program. 46,148 (La. App. 2 Cir. 3/23/11), 59 So.3d 564.[14] The Second Circuit ruled Mr. Blackledge "was still incarcerated, even though extended the privilege of occupancy in a halfway house," noting that "[a] work-release program[] . . . is one point on a continuum of possible punishments." *Id.* at p. 4, 59 So.3d at 567. As the Second Circuit explained, the fact that Mr. Blackledge "did not return to a correctional facility at the end of each work day, but instead returned to a halfway house" constituted "a distinction without a difference." *Id.* at pp. 3-4, 59 So.3d at 567. Likewise, Mr. Gaber's status at the VA residential reentry center was part of his federal punishment. That he returned to the VA residential reentry center after his work days instead of a federal correctional facility and sometimes received permission to go to 3617 Corinne was a distinction without a difference.

Our finding is that the restraints on Mr. Gaber's freedom rendered him an incarcerated person under La. C.C.P. art. 1235.1. That is, despite the fact that he had a weekend pass that enabled him to sometimes go to his family home at 3617 Corinne, Mr. Gaber had institutional constraints on his freedom that necessitated personal service in this situation. Mr. Gaber did not have control over his own schedule, where he stayed each night, and his freedom of movement like a non-incarcerated individual enjoys. In Appellees' Petition to Annul, Mr. Gaber met his

---

[13] The terms "halfway house" and "residential reentry center" are interchangeable. *About Our Facilities*, FEDERAL BUREAU OF PRISONS (last visited Jan. 23, 2026), https://www.bop.gov/about/facilities/residential_reentry_management_centers.jsp.

[14] The workers' compensation statute in question provides that an "employee's right to compensation benefits, including medical expenses, is forfeited during any period of incarceration . . . ." La. R.S. 23:1201.4.

burden of proving service was not appropriately made because the domiciliary service effectuated upon his wife at 3617 Corinne in June 2019 was improper. MABB had to personally serve Mr. Gaber. Therefore, the trial court correctly granted Appellees' Petition to Annul and annulled MABB's default judgment with respect to Mr. Gaber; so we affirm the trial court's judgment. We emphasize, however, that our holding is limited to the facts and circumstances of this case.

## DECREE

For the foregoing reasons, we affirm the trial court's February 18, 2025 judgment insofar as it granted Appellees' Petition to Annul and annulled MABB's default judgment as to Mr. Gaber.

**AFFIRMED**